IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

UNITED STATES OF AMERICA,

        Plaintiff,        Case No. 3:05 CR 717

-vs-

                            MEMORANDUM OPINION
ELODIO MENDOZA-SANCHEZ,     AND   ORDER

        Defendant.

KATZ, J.

Pending before the Court is the Magistrate Judge's Report and Recommendation addressing the Defendant's motion to suppress evidence. (Doc. No. 16), as to which the Government has filed objections, and the Defendant has filed a brief in support of those recommendations by the Magistrate Judge. This Court held a hearing on those objections and thereafter received memoranda from both the Government and the Defendant. For the reasons which follow, the Magistrate Judge's Report and Recommendation will be adopted in part only.

## BACKGROUND

A one count indictment was filed against the Defendant on March 2, 2005 wherein he was charged with possession with intent to distribute approximately 5 kilograms of cocaine, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(A). The Defendant filed a motion to suppress any and all evidence obtained as a result of the February 9, 2004 search of his person and his hotel room, asserting that the same was in violation of his Fourth Amendment rights.

The Magistrate Judge held a suppression hearing on June 14, 2005 at which time witnesses were heard. The Magistrate Judge's Report and Recommendation sets forth the findings of fact which she deduced as a result of briefings and the hearing, and they are set forth as follows:

> At the suppression hearing on June 14, 2005, the government presented two witnesses from the Ohio Bureau of Criminal Investigation (BCI), Michael Masterson and Andy Mulinix. Special Agent Masterson testified that he has worked with BCI for approximately 20 years and has been assigned to the drug investigation unit during his tenure (Tr. 5-6).
>
> On Wednesday, February 9, 2005, about 10:00 a.m., Vern Dunn, Resident Agent in Charge (RAC) of the Toledo office of the Drug Enforcement Agency (DEA), called Masterson to request assistance with a law enforcement action. Agent Dunn advised that four persons had been arrested in Detroit with five kilograms of cocaine a day earlier and that one or two of the arrested individuals were cooperating with DEA agents in Detroit. The cooperating persons advised that the source of the Detroit cocaine was in Toledo. Dunn further advised that the source of the cocaine was reportedly staying at a Toledo hotel near a Denny's restaurant and the source had an additional five kilograms of cocaine. The vehicle in which the source was traveling was described as a red S.U.V. with a State of Washington registration (Tr. 7).
>
> While attempting to locate the red S.U.V., Masterson personally checked hotels and motels in the area. At approximately 11:25 a.m., he located a red Lincoln S.U.V. with an Oregon registration at the Comfort Inn on Secor in Toledo. When Masterson ran the registration, two owners with Hispanic names were listed. He shared this information with RAC Dunn (Tr. 8).
>
> About 11:45 a.m. Agent Hill of Detroit DEA told Masterson that the Toledo suspect was scheduled to meet with one of the persons from the drug transaction of the prior evening at a Toledo Mexican restaurant near the hotel to collect $100,000 (Tr. 9). Hill identified Elodio Mendoza-Sanchez as the potential source of the cocaine delivered in Detroit based upon a cell phone number provided by one of the cooperating individuals. The subscriber information listed Mendoza-Sanchez as the subscriber (Tr. 10-11). Hill described Mendoza-Sanchez as a slender Hispanic male, five feet five to five feet seven inches tall with slight facial hair. Hill further stated that the alleged source was traveling with a Hispanic female and small child.
>
> Masterson continued surveillance of the red Lincoln S.U.V. at the Comfort Inn. About 12:10 p.m., he saw a Hispanic male and female with a small child leave the hotel and enter the red S.U.V. They matched the description given by Hill. About ten minutes later, the red S.U.V. left the hotel parking lot, turned right onto Secor, proceeded to Monroe Street and then turned right onto Monroe Street going to a Sunoco gas station to obtain fuel (Tr. 13). Masterson alerted the surveillance team he had called for assistance (Tr. 12).

2

As the S.U.V. was refueling, Agent Hill contacted Masterson and advised him that two of the four individuals arrested the night earlier had been released and were making phone calls possibly to warn Mendoza-Sanchez. At Hill's request, Masterson, who was running this stage of the investigation, ordered the surveillance officers to stop the red S.U.V. if possible (Tr. 13).

As the stop occurred, law enforcement officers engaged lights and possibly sirens on their vehicles. Masterson's vehicle blocked the driveway to the Sunoco Station on Monroe Street. The officers exited their vehicles with their weapons drawn. Masterson removed the Hispanic female from the vehicle, patted her down for officer safety and during an attempt to talk to her determined that she was unable to speak or understand English. He permitted her to return to the vehicle with the child (Tr. 14-15).

Within a minute or two after the stop, the area seemed secure, and the officers holstered their weapons. Masterson turned his attention to the driver whom he identified in court as the defendant seated at the table wearing a brown jump suit. When asked his name at the Sunoco Station, defendant responded that he was Elodio Mendoza-Sanchez. As to ownership of the vehicle, Mendoza-Sanchez stated that his sister who lived in Oregon owned the vehicle and permitted him to drive it to the area to visit friends. Mendoza-Sanchez was unable to provide the names of his friends or where they lived (Tr. 16).

Masterson advised Mendoza-Sanchez that law enforcement knew more than he thought and then inquired whether he was transporting any drugs. Mendoza-Sanchez responded negatively and gave verbal consent to search his vehicle and his room at the Comfort Inn. At that time, no guns were pointed at Mendoza-Sanchez as the officers had re-holstered their weapons. In Masterson's opinion, Mendoza-Sanchez spoke very good English and appeared to understand the entire conversation. When describing Mendoza-Sanchez' demeanor, Masterson said he was very polite, cooperative and did not appear to be under the influence of any drugs, alcohol or other intoxicant (Tr. 17-18, 24).

Masterson and DEA task force agent Nelson drove the S.U.V. with Mendoza-Sanchez' wife and child back to the Comfort Inn. Masterson testified that he did not recall Mendoza-Sanchez' wife ever being handcuffed during the encounter. During the ride back to the hotel, she sat behind or next to the child. Masterson asked Agent Mulinix to transport Mendoza-Sanchez back to the Comfort Inn. Masterson contacted Special Agent Mark Ellinwood, a canine officer, to determine whether Elodio Mendoza-Sanchez had registered at the Comfort Inn in Room 219. Ellinwood met Masterson in the hotel lobby and advised that Mendoza-Sanchez was registered and assigned to Room 219. Mulinix escorted Mendoza-Sanchez to his hotel room (Tr. 19-20).

When Masterson arrived in Room 219 about 12:55 p.m., he had Mendoza-Sanchez' handcuffs removed and thanked him for his cooperation (Tr. 21). Before agents began to search, Masterson asked whether there were drugs in the room. Mendoza-Sanchez responded by advising that his wife and child were not involved and he requested assurance that his wife would not be prosecuted. Although he was

unable to make deals, Masterson said he would advise the Special Agent in charge and the U. S. Attorney's Office of Mendoza-Sanchez' continued cooperation. No threats or promises were made to obtain Mendoza-Sanchez' consent to search. Masterson denied telling or hearing agents tell Mendoza-Sanchez that his wife would be prosecuted and that the Children Services Board would take his child away.

Mendoza pointed to the dresser and said there were five kilograms under the dresser. Mulinix and Deputy Sheriff Mike Corbett lifted the dresser and found five small kilo sized packages which were secured by Detective Rowe (Tr. 21-22).

Masterson read Mendoza-Sanchez his rights from Ellinwood's standard DEA *Miranda* card. The warnings on the card included defendant's right of silence, that anything he said could be used against him and his right to counsel and that he would be appointed counsel if he was unable to afford counsel (Tr. 23). Mendoza-Sanchez acknowledged that he understood his rights, voluntarily gave up those rights and still wanted to cooperate with the agents. Masterson denied making any threats or promises to obtain defendant's consent to search the vehicle or hotel room (Tr. 24). He further denied telling or hearing any officer tell defendant that his wife would be prosecuted and Children's Services Board would take away his child (Tr. 25). Mulinix continued to interview Mendoza-Sanchez.

Special Agent Andy L. Mulinix was the second government witness. He has been employed by BCI for about 12 years and is currently assigned to the financial unit of the major crimes section with an office in Bowling Green (Tr. 39). He was contacted about noon on February 9, 2005, by Masterson who requested assistance in an ongoing drug investigation and asked Mulinex to go to the Comfort Inn on Secor near I-475. He followed the S.U.V. from the Comfort Inn parking lot to the Sunoco Station where the officers approached the vehicle and ordered the occupants to exit the vehicle. Mulinix testified that the weapons of the law enforcement officers were displayed as standard procedure in drug operations (Tr. 40-41).

In the Sunoco lot, Mulinix approached the rear passenger's side of the vehicle. Mulinix identified the driver of the S.U.V. as Elodio Mendoza-Sanchez and identified him in Court as the defendant. The occupants were ordered to exit the vehicle and they complied. Initially, Mulinix remained with the female. About fifteen minutes later, Masterson told Mulinix that Mendoza-Sanchez was cooperating, had consented to a search of the hotel room and asked Mulinix to transport defendant's wife back to the Comfort Inn. During the ride, the only conversation related to Mendoza-Sanchez' request for a cigarette which Mulinix provided because Mendoza-Sanchez was cooperating, Mulinix testified that he was handcuffed in front rather than the normal procedure of handcuffing an arrested person in the back and placing him/her in the rear of the vehicle.

At the Comfort Inn, Mendoza-Sanchez was escorted to Room 219 by other officers. When Mulinix arrived in the room, Masterson was talking to Mendoza-Sanchez. He heard Masterson thanking Mendoza-Sanchez for his continued cooperation. Mulinex also testified that Mendoza-Sanchez expressed concern

regarding the arrest of his wife and daughter. Masterson agreed to talk to persons with more authority and advised that he could not make any promises. Mulinex saw Mendoza-Sanchez point to the console and say that there were five kilos under there. Mulinex and Corbett picked up the cabinet and pulled out five kilo sized packages. He later heard Masterson read Mendoza-Sanchez his *Miranda* rights. Mendoza-Sanchez provided information about the source of the five kilos, that he brought them from the Oregon, California, area and they were transported by another person in a late model Chevy.

During the period that they spoke, Mulinex described the demeanor of Mendoza-Sanchez as very calm and very polite. Mendoza-Sanchez did not appear to be under the influence of alcohol, drugs or other intoxicants. Mulinix denied stating or hearing any other officers indicate that Mendoza-Sanchez' wife would be placed in handcuffs and prosecuted and that his child would be taken away from him.

Subsequently while at the DEA Office, Mulinix testified that Mendoza-Sanchez stopped cooperating because he was asked to make a phone call which he refused to do. Mendoza-Sanchez said that he declined to make the phone call because he feared for his safety if he identified his drug source. Mulinix said no threats or promises were made to Mendoza-Sanchez in exchange for his cooperation.  He was unaware of any videotapes made of the arrest or events leading to defendant's arrest.

Following a recess to permit Mendoza-Sanchez to confer with his counsel regarding the decision to testify or not, Mendoza-Sanchez elected to testify (Tr. 52-57). Prior to the recess and before Mendoza-Sanchez took the witness stand, the Court and his counsel advised Mendoza-Sanchez of his right of silence and the risks of testifying. The Court instructed government counsel that cross-examination would be strictly limited to areas covered by Mendoza-Sanchez' direct examination (Tr. 57-58).

Mendoza-Sanchez testified that although Mulinix and Masterson testified that at the time of his arrest, his wife was not handcuffed, he was 100 percent certain that his wife was in handcuffs for a few minutes in the car at the gas station. During a phone conversation with his wife, she told him that the handcuffs were removed when they returned to the hotel reception area because their daughter was crying (Tr. 61). Mendoza-Sanchez testified that Masterson threatened to call the Children Services Bureau if Mendoza-Sanchez refused consent  to search the car and it was uncertain when he could see his daughter again. In response, Mendoza-Sanchez said he agreed to the search of the car. The agents did not threaten to charge his wife.

While at the gas station, Mendoza-Sanchez gave Masterson consent to search the hotel room. He corroborated Masterson's statement that he was unable to guarantee that no charges would be filed against Mendoza-Sanchez' wife; however, Masterson agreed to ask persons with greater authority to make the decision not to prosecute. Mendoza-Sanchez cooperated and told them where the five kilos were located and where he had delivered the other kilos. He agreed to the

5

search of the room and to cooperate based upon the threat from Masterson that his refusal to consent would result in having his child taken by state authorities (Tr. 64). Mendoza-Sanchez testified that the agents who testified and those who originally stopped him were polite and non threatening. He admitted during cross-examination that he had used a false name when attempting to enter the United States four or five years ago (Tr. 65).

(R&R, pp. 2-8).

## ANALYSIS

In her Report and Recommendation the Magistrate Judge reviewed the case law on which her recommendation to exclude or suppress the evidence was based; in this *de novo* review it is unnecessary to repeat the same.  Among other factors discussed in the Report was whether the Defendant or a reasonable man in the Defendant's position would have felt free to leave.  Relying on *U.S. v. Swanson*, 341 F.3d 524 (6th Cir. 2003) the Magistrate Judge concluded that at the initial stop the "Defendant was not free to leave as several law enforcement vehicles with sirens and possibly flashing lights had surrounded him and blocked his departure." (R&R, p. 11).

The response to the initial stop at the gas station was that Defendant acquiesced in the officers' request to go to his hotel room.  The Court agrees that his freedom of movement during the period of questioning was clearly restrained; the Defendant was placed in handcuffs and escorted back to the hotel in a law enforcement vehicle.  There is grave question as to whether the Defendant "voluntarily" acquiesced to the request to answer questions.

In view of the totality of the circumstances, the Magistrate Judge concluded and the Court agrees that a reasonable person in this Defendant's position would not have felt free to leave; therefore, the totality of circumstances does, in fact, support a conclusion that a custodial interrogation was conducted without *Miranda* protections.  That conclusion, however, does not prove fatal to all of the items suppressed by the Magistrate Judge.

6

While clearly the statements made by the Defendant are to be suppressed, the remaining issue is whether the drugs identified by the Defendant and found by the officers in his hotel room are similarly to be suppressed. Defendant was not given his *Miranda* warnings until after he entered his hotel room and pointed out the location of the drugs. All statements by the Defendant, including pointing out the drugs, are suppressed. However, as a result of a fractured opinion by the United States Supreme Court in *U. S. v. Patane*, 542 U.S. 630 (2004) physical evidence derived from *unwarned* voluntary statements are admissible at trial.

Justice Thomas, writing for a three-Justice plurality, noted "that the core protection afforded by the Self-Incrimination Clause is a prohibition on compelling a criminal defendant to testify against himself at trial." *Id.* at 637. He also emphasized that the Self-Incrimination Clause "cannot be violated by the introduction of non-testimonial evidence obtained as a result of voluntary statements." *Id*. The majority rejected the extension of the "fruit of the poisonous tree" doctrine to *Miranda* violations, drawing a distinction between Fourth Amendment and Fifth Amendment situations.

*Patane* has been widely criticized by legal scholars because of the failure to suppress the physical fruits of the suspect's unwarned, although in some instances voluntary, statements. Justice Thomas' articulated position thus becomes the position of the Court through *Patane*; the Fifth Amendment is only a testimonial privilege and, under that view, there is no need to suppress physical evidence gleaned from questioning when *Miranda* warnings were not properly administered. While this Court strongly disagrees with *Patane*, lower federal courts are bound to follow the precedence established through the holdings of upper courts.

The objections of the Government to the Report and Recommendation of the Magistrate Judge are denied in part and granted in part. Therefore, while the statements made by Mendoza-Sanchez are suppressed, the drugs found as a result of the search, even though their location was articulated by either statement or gesture of the Defendant, are admissible.

IT IS SO ORDERED.

                                                  s/ *David A. Katz*
                                                  DAVID A. KATZ
                                                  SENIOR U. S. DISTRICT JUDGE